SHELL OIL COMPANY, Plaintiff-Appellee, *v.* THE DEPARTMENT OF REVENUE *et al.*, Defendants-Appellants.

Fourth District   No. 4—82—0342

Opinion filed August 29, 1983.—Rehearing denied September 27, 1983.

Tyrone C. Fahner, Attorney General, of Springfield (Paul J. Bargiel, Special Assistant Attorney General, of Doss, Puchalski, Keenan & Bargiel, Ltd., of counsel), for appellants.

Charles G. Chester, Thomas H. Donohoe, and Nicholas J. Nedeau, all of Martin, Craig, Chester & Sonnenschein, of Chicago (John A. Hoffman, of Houston, Texas, of counsel), for appellee.

JUSTICE TRAPP delivered the opinion of the court:

The Department of Revenue (Department) appeals the trial court's reversal, on administrative review, of its decision that certain equipment installed by plaintiff, Shell Oil Company, at its Wood River, Illinois, refinery, is not tax exempt since the equipment does not have pollution control as its "primary purpose" within the meaning of section 2a of the Use Tax Act (Ill. Rev. Stat. 1979, ch. 120, par. 439.2a). We affirm in part and reverse in part.

The present controversy began on December 4, 1979, when the Department issued plaintiff a notice of tax liability for alleged deficiencies in State and county retailers' occupation taxes and use taxes. Taxpayer filed a timely notice of protest, paid the taxes, filed a claim for credit, and the matters were consolidated for hearing before the Department. At the conclusion of the hearing, a number of purchases were found to be exempt with the exception of the three items at issue here: smokestacks connected to taxpayer's EPA-mandated catalytic precipitator, two large storage tanks, and modifications in the refinery fuel system.

Section 2a of the Use Tax Act allows an exemption from use tax for pollution control facilities used to abate pollution. This section provides:

" 'Pollution control facilities' means any system, method, construction, device or appliance appurtenant thereto sold or used or intended for the primary purpose of eliminating, preventing, or reducing air and water pollution as the term 'air pollution' or 'water pollution' is defined in the 'Environmental Protection Act', enacted by the 76th General Assembly, or for the primary purpose of treating, pretreating, modifying or disposing of any potential solid, liquid or gaseous pollutant which if released without such treatment, pretreatment, modification or disposal might be harmful, detrimental or offensive to human, plant or animal life, or to property.

The purchase, employment and transfer of such tangible personal property as pollution control facilities is not a purchase, use or sale of tangible personal property." (Ill. Rev. Stat. 1979, ch. 120, par. 439.2a.)

The issue to be decided *sub judice* is whether taxpayer's capital expenditures constitute a system, or appliance appurtenant thereto

which is intended for the primary purpose of reducing air pollution.

Taxpayer operates two "catalytic cracking units" at its refinery which are designed to produce primarily gasoline by causing a crude oil derivative to "crack" into smaller, lighter hydrocarbon molecules. The cracking takes place by heating the crude oil derivative in the presence of a catalyst. After this process, the catalyst becomes contaminated with carbon and is then sent to a "cat cracker regenerator" where the carbon is burned off and the catalyst is recycled. Taxpayer formerly discarded the hot gas from the regenerator through two older smokestacks, but following notification from the Illinois Environmental Protection Agency (EPA) that the particles of the catalyst were being discharged from the stack, a precipitator was installed to reduce the emission. The precipitator's function is to extract the catalyst from the gases which are then dispersed through the two new smokestacks at issue here.

The precipitator is a large structure which had to be built some distance away from the "cat cracker regenerator" due to congested conditions at the refinery and is connected to the regenerator by large 10-foot diameter ducts. Taxpayer had two options for disposing of the clean gas from the precipitator: Additional ducts could have been constructed to take the clean gas back to the old smokestacks, or taxpayer could have built new smokestacks adjacent to the precipitator. Plaintiff's plant engineer testified that the latter approach was adopted because the former would have required an extremely expensive system of duct work. The Department allowed an exemption for the duct work which carries the gas from the regenerator to the precipitator, the precipitator itself, and the conveyor units which carry away the particulate from the precipitator, but denied an exemption for the smokestacks.

The other two capital projects at issue involved changes in the storage and distribution system of a portion of the fuel used in the refinery operations. These changes were made to comply with EPA sulphur emission requirements at the refinery and consisted of the construction of storage tanks and revisions in the way the refinery distributed the fuel. The fuel with which these two projects are concerned is called "pitch" and is a by-product of the distillation of crude oil. This by-product is used by the taxpayer to make asphalt in the summer and to help fuel the refinery operations in the winter.

The environmental problems arose as a result of taxpayer's combining sweet, or low sulphur crude oil, and sour, or high sulphur crude oil, in the distillation unit which produced pitch with a high sulphur content. Eventually the EPA notified Shell that the pitch which was

being burned at the refinery emitted too much sulphur and had to be eliminated. Taxpayer scrutinized a number of alternatives to reduce sulphur emissions and eventually decided upon a three-part plan. The first step involved changes in the refinery distribution process to allow low sulphur crude oil to be distilled at one time and high sulphur crude oil at another. The second part involved the construction of large storage tanks to segregate the low sulphur pitch from the high sulphur pitch, and the final phase involved changes in the refinery fuel distribution system. According to plaintiff's engineer, the latter phase enabled plaintiff to "get the right fuel to the right heaters in the right combination so we could burn the fuel [low sulphur pitch] and comply with the regulations."

The Department of Revenue relies upon *Illinois Cereal Mills, Inc. v. Department of Revenue* (1976), 37 Ill. App. 3d 379, 346 N.E.2d 69, to support the taxability of both the smokestacks and the storage tanks. In that case, under threat of action by the EPA, plaintiff installed gas-fired boilers to replace coal-fired boilers which created a pollution problem. Although the coal-fired boilers were in satisfactory condition to continue supplying plaintiff's steam needs indefinitely, plaintiff received no economic benefit in making the installation, and plaintiff's reason for installing the gas-fired boilers was to meet environmental requirements of government agencies, we found that the gas boilers were not exempt since their primary purpose was to produce heat for the purposes of carrying on taxpayer's industrial operation of drying grain. Shell notes that we stated in *Illinois Cereal Mills* that the primary purpose language "does not seem to refer to equipment like the gas fired boilers even though they were installed because they were less polluting than the equipment formerly used. Rather the words refer to equipment such as precipitators, filters, and smoke stacks, which have no substantial function in the manufacturing or processing of a product other than to abate the pollution caused by the plant operation." 37 Ill. App. 3d 379, 381-82, 346 N.E.2d 69, 71.

■ In *Du-Mont Ventilating Co. v. Department of Revenue* (1978), 73 Ill. 2d 243, 383 N.E.2d 197, the supreme court indicated that a necessary, appurtenant appliance to a facility which has as its primary purpose the elimination, prevention, or reduction of pollution is entitled to exemption from use tax under section 2a of the Act notwithstanding that the appurtenant appliance itself does not directly reduce or eliminate pollution. At issue there was an intake system for a "push-pull" ventilation filtering system. In interpreting section 2a of the Act, the court noted:

"The exemption applies not only to systems 'used or intended for the primary purpose of eliminating, preventing, or reducing air and water pollution' but to systems 'appurtenant thereto' as well. [Citation.] *** It is abundantly clear that the intake system is appurtenant, *i.e.*, appropriate or accessory to the pollution control facility. [Citation.]" (73 Ill. 2d 243, 248, 383 N.E.2d 197, 200.)

The uncontradicted evidence indicates that the catalytic cracker precipitator system consists of several components (*i.e.*, steel ducts to carry the gas to the precipitator, supporting steel for the ducts, the precipitators themselves, conveyors to carry the particulate matter to dumpsters, and two smokestacks) all of which were part of the same construction project and necessary for the functioning of the precipitator. The Department's contention that the new smokestacks were not necessary because taxpayer could have used the old smokestacks is without merit. Had taxpayer followed this approach, it would have had to construct a more expensive system of duct work which also would have been exempt from tax as an appurtenant appliance. As such, the trial court correctly held that the Department's failure to exclude the smokestacks from taxation was against the manifest weight of the evidence.

■ Regardless of whether the stacks are treated as primary methods of eliminating pollution or are treated as appurtenant to necessary pollution control devices, we find that the stacks are tax exempt within the meaning of the statute and of the controlling authorities.

■ The revision in the refinery fuel system and the construction of the asphalt storage tanks, however, were neither appurtenant to any pollution control facilities nor did they have as their primary purpose the elimination, reduction or prevention of air pollution. Although these changes were subjectively motivated by a desire to comply with EPA sulphur emissions at plaintiff's refinery, their predominant purpose was to enable plaintiff to produce asphalt from high sulphur pitch and burn the low sulphur pitch as fuel in the refinery. Our opinion in *Illinois Cereal Mills* clearly eschewed any reliance on a subjective purpose test as a basis for determining the "primary purpose" of alleged pollution control equipment. As we noted in that opinion: "The words in section 2a, 'sold or used or intended for the primary purpose of' reducing or eliminating certain types of pollution does not seem to refer to equipment like the gas fired boilers *even though they were installed because they were less polluting than the equipment formerly used.*" (Emphasis added.) (37 Ill. App. 3d 379,

1054

381, 346 N.E.2d 69, 71.) We affirm the judgment of the trial court determining that the stacks were tax exempt but reverse that judgment upon the exemption accorded the storage tanks and the fuel system. We remand the cause for computation and determination of the credit consistent with the opinion.

Affirmed in part; reversed in part; and remanded, with directions.

MILLS and GREEN, JJ., concur.