CENTRAL ILLINOIS PUBLIC SERVICE COMPANY, Plaintiff-Appellee, v. THE DEPARTMENT OF REVENUE, Defendant-Appellant.

Fourth District   No. 4—86—0714

Opinion filed July 16, 1987.

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Bret A. Rappaport, Assistant Attorney General, of Chicago, of counsel), for appellant.

Julian C. D'Esposito, Jr., and Robert T. Isham, Jr., both of Isham, Lincoln & Beale, of Chicago, for appellee.

JUSTICE McCULLOUGH delivered the opinion of the court:

The Department of Revenue of the State of Illinois (Department) appeals from an order of the circuit court of Sangamon County reversing an administrative decision which denied Central Illinois Public Service Company (CIPS) an exemption from the Illinois Use Tax Act (Act) (Ill. Rev. Stat. 1985, ch. 120, par. 439.2a). CIPS sought an exemption for the purchase of certain railway cars, used in connection with pollution control facilities.

On appeal, the Department maintains that the railway cars, which are utilized to transport minerals for use in an air pollution "scrubber system," do not qualify for tax-exempt status under the Act. We agree with the Department and consequently reverse the circuit court order.

CIPS is a public utility which produces electrical power by means of a coal-fired power generating plant. The plant is located near Newton, Illinois. Pursuant to State and Federal environmental regulations, CIPS was required to install a "scrubber system" to eliminate concentrations of sulfur dioxide ($SO_2$), which result from burning high sulfur coal. The scrubber system has been certified by the Illinois Environmental Protection Agency as a "pollution control facility" for property tax purposes. Ill. Rev. Stat. 1985, ch. 120, par. 439.2a.

The "Newton scrubber system" reduces $SO_2$ emissions through a scientific method by which $SO_2$ is absorbed from stack gas emissions and then reduced to a solid form which is disposed of in a landfill. While the actual process is scientifically complex, a generalized version of the pollution reduction procedure will suffice for our purposes.

Initially, flue gas from the power station is sprayed with a scrubbing liquor consisting primarily of sodium sulfite. This liquor reacts with the $SO_2$ in the gas to form sodium bisulfite, which is continuously bled off in liquid form and pumped into reaction tanks. In the reaction tanks, lime is added to the sodium bisulfite, creating sodium sulfite and calcium sulfite. The sodium sulfite in liquid form can then be reused in the scrubbing liquor. The calcium sulfite is a solid which is ultimately forced out of the system through an extractor filter. The calcium sulfite later becomes a solid waste product which is disposed of in a landfill located near the scrubber.

Before the sodium sulfite can be reused in the scrubber liquor, soda ash must be added to provide "makeup" sodium in replacement for sodium sulfite lost in the extraction process. Thus, the soda ash "regenerates" the scrubbing liquor. Lime and soda ash are essential additives to the scrubbing liquor, which removes the pollutant and enables CIPS to comply with the applicable State and Federal environ-

mental laws.

CIPS purchased covered hopper railway cars to transport the lime and soda ash used in the scrubber system. The system requires approximately 250 tons of lime and 25 tons of soda ash daily. The cars are specifically designed to carry and unload caustic materials such as lime and soda ash. They are equipped with special top coverings and underneath unloading devices, which keep the materials inside from escaping, keep them dry, and keep them from coming into contact with the people working around them.

Prior to purchasing the railway cars, CIPS leased cars from a railroad company. The leasing arrangement, however, caused serious delivery problems. Cars were often unavailable and consequently, sufficient supplies could not be assured. Additionally, the leased cars were sometimes incompatible with the Newton plant's unloading system. At various times before CIPS purchased the railway cars, it was forced to shut down the scrubber system because sufficient quantities of lime and soda ash had not been promptly delivered. All problems were alleviated by the purchase of the railway cars.

Although the railway cars are used primarily to transport minerals to the scrubber system, they are also used for temporary on-site storage of the minerals prior to use at the Newton plant. While the railway cars could be utilized to transport other materials, they are used exclusively in conjunction with the operation of the scrubber system. CIPS maintains that they would not have purchased the cars but for the need to efficiently operate the scrubber system. The railway cars were purchased subsequent to EPA certification of the scrubber system as a "pollution control facility." The cars were not separately certified by the EPA as "pollution control facilities."

The Department conducted a sales and use tax audit of CIPS for the period between July 1979 and June 1982. The audit indicated that CIPS owed tax for 12 separate items which were claimed exempt as "pollution control facilities" or were taxable as "special order" items under the Service Use Tax Act. CIPS made partial payment and the Department amended its original findings. CIPS then protested the assessment again and requested a hearing.

On November 27, 1984, at a hearing before the Department, the parties agreed that the hearing would only cover those items claimed exempt as "pollution control facilities." On September 17, 1985, the hearing officer issued his findings. Ten of the twelve items for which CIPS had claimed an exemption were found to be "pollution control facilities" and were therefore exempt from sales or use taxation. The hearing officer further found that the two remaining items, the rail-

way cars and a servicing system, did not qualify for tax-exempt status. Only the railway cars' tax status is before us on appeal.

The hearing officer specifically noted that the railway cars were not a "physical component of the scrubber facility," nor were the cars "separately certified by the EPA as a 'pollution control facility.'" Additionally, the hearing officer stated that the railway cars "do not perform any function which reduces air pollution or disposes of solid pollutants." Accordingly, the Department assessed use tax on CIPS for the railway cars.

On October 15, 1985, CIPS filed a complaint for administrative review. The circuit court of Sangamon County reversed the Department's administrative decision. The court found that the Department failed to apply the correct test to determine whether the railway cars were tax exempt. Initially, the court stated that the test to be applied in determining tax-exempt status as a "pollution control facility" is "whether the primary purpose of the item is pollution control. (See *e.g. DuMont Ventillating Co. v. Dept. of Revenue,* 73 Ill. 2d 243, 383 N.E.2d 197 (1978); *Heller v. Fergus Ford Co.,* 59 Ill. 2d 576, 322 N.E.2d 441 (1975); *Shell Oil Co. v. Dept. of Revenue,* 117 Ill. App. 3d 1049, 453 N.E.2d 125 (4th Dist. 1983))." The court then proceeded to apply a "but for" analysis stating that "but for environmental regulations governing sulfur dioxide emissions at the Newton power station, CIPS would have no need for the railway cars and would not have purchased them." As a result, the court found that the railway cars are "clearly a component of the scrubber system although they are not physically attached."

On appeal, the Department maintains that the court erred in finding the hearing officer's conclusions incorrect as a matter of law.

Section 2a of the Use Tax Act allows an exemption from use tax for pollution control facilities used to abate pollution. (Ill. Rev. Stat. 1985, ch. 120, par. 439.2a.) The legislative intent underlying such exemptions is to encourage businesses and industry to make expenditures to comply with the environmental regulations of governmental agencies. (*Illinois Cereal Mills, Inc. v. Department of Revenue* (1976), 37 Ill. App. 3d 379, 380-81, 346 N.E.2d 69, 70.) The Act, however, limits this exemption, specifically providing:

> "'Pollution control facilities' means any system, method, construction, device or appliance appurtenant thereto sold or used or intended for the primary purpose of eliminating, preventing, or reducing air and water pollution as the term 'air pollution' or 'water pollution' is defined in the 'Environmental Protection Act', enacted by the 76th General Assembly, or for the primary

purpose of treating, pretreating, modifying or disposing of any potential solid, liquid or gaseous pollutant which if released without such treatment, pretreatment, modification or disposal might be harmful, detrimental or offensive to human, plant or animal life, or to property." Ill. Rev. Stat. 1985, ch. 120, par. 439.2a.

The Department of Revenue has further narrowed this exemption, ruling that it "does not extend to *** any other tangible personal property which may be used in some way in connection with such equipment, but which is not made a physical component part of the equipment itself." 86 Ill. Adm. Code, sec. 130.335(a)(1985).

■■ ■ Provisions granting tax exemptions are to be strictly construed against the taxpayer and in favor of the taxing party. (*People ex rel. Kassabaum v. Hopkins* (1985), 106 Ill. 2d 473, 476, 478 N.E.2d 1332, 1333; *LeTourneau R.R. Services, Inc. v. Department of Revenue* (1985), 134 Ill. App. 3d 638, 642, 481 N.E.2d 864, 867.) The burden is upon the party claiming the exemption to clearly demonstrate that the property falls within the exemption. (*People ex rel. Kassabaum v. Hopkins* (1985), 106 Ill. 2d 473, 476, 478 N.E.2d 1332, 1333; *LeTourneau R.R. Services, Inc. v. Department of Revenue* (1985), 134 Ill. App. 3d 638, 642, 481 N.E.2d 864, 867.) On appeal from a judgment of the circuit court in administrative review, the appellate court must affirm the agency ruling unless the findings in the decision of the administrative agency are found to be contrary to the manifest weight of the evidence. *LeTourneau R.R. Services, Inc. v. Department of Revenue* (1985), 134 Ill. App. 3d 638, 642, 481 N.E.2d 864, 867.

■■ The Act specifically exempts systems or methods whose primary purpose is the elimination of air pollution. (See *Du-Mont Ventilating Co. v. Department of Revenue* (1978), 73 Ill. 2d 243, 383 N.E.2d 197; *Shell Oil Co. v. Department of Revenue* (1983), 117 Ill. App. 3d 1049, 453 N.E.2d 125; *Columbia Quarry Co. v. Department of Revenue* (1987), 154 Ill. App. 3d 129, 506 N.E.2d 795.) This "primary purpose" language has been construed to encompass equipment which has no substantial function other than to abate pollution (*Illinois Cereal Mills, Inc. v. Department of Revenue* (1976), 37 Ill. App. 3d 379, 381-82, 346 N.E.2d 69, 71), or equipment which is a necessary and integral part of a system or method for the elimination of air pollution. (*Columbia Quarry Co. v. Department of Revenue* (1987), 154 Ill. App. 3d 129, 506 N.E.2d 795.) This court continues to eschew any reliance on a subjective purpose test as a basis for determining the "primary purpose" of alleged pollution control equipment. *Shell Oil Co. v. Department of Revenue* (1983), 117 Ill. App. 3d 1049, 1053, 453 N.E.2d

125, 128, citing *Illinois Cereal Mills, Inc. v. Department of Revenue* (1976), 37 Ill. App. 3d 379, 346 N.E.2d 69.

■■ Evidence in the case at hand was undisputed that the railway cars were purchased to transport minerals to the scrubber system due to the problems inherent in the leasing arrangement. It is clear that the primary purpose of the cars was transportation and that the ultimate pollution control was incidental. The Department's hearing officer, based on this evidence, recommended that the exemption be denied. Upon review, such findings of an administrative agency are held to be *prima facie* correct. *Illinois Cereal Mills, Inc. v. Department of Revenue* (1976), 37 Ill. App. 3d 379, 346 N.E.2d 69.

The circuit court's reliance upon *Central Illinois Light Co. v. Department of Revenue* (1983), 117 Ill. App. 3d 911, 453 N.E.2d 1167, must be addressed. In *Central Illinois Light*, the court found the electric company's cooling pond and fly ash collection station to be tax exempt as "pollution control facilities." These facilities, however, were deemed tax exempt because they had been certified by the EPA as "pollution control facilities." The court specifically stated that "such certification is conclusive evidence that the facility's purpose is pollution control," thereby entitling Central Illinois Light to tax exemptions. (117 Ill. App. 3d 911, 914, 453 N.E.2d 1167, 1169.) The court went on, in *dicta*, to state that Central Illinois would not need the equipment were it not for the environmental pollution regulations. 117 Ill. App. 3d 911, 916, 453 N.E.2d 1167, 1170.

■■ It is from this *dicta* that the Sangamon County circuit court adopted a "but for" analysis. Case law, however, indicates that the primary purpose test applicable to pollution control facilities does not involve a "but for" analysis. The primary purpose test seeks to determine the function and ultimate objective of the equipment alleged to be exempt. Only those facilities directly involved in the pollution abatement process are to be afforded special tax status. Since the railway cars were not certified by the EPA as a pollution control facility and since their primary purpose is to facilitate transportation, they are not pollution control facilities within the purview of the Act. As such, the judgment of the circuit court is reversed and the decision of the Department of Revenue is affirmed.

Judgment reversed.

LUND and KNECHT, JJ., concur.